Nicholas D. Myers (State Bar No. 251809)
  nicholas@themyerslg.com
Michael M. Kowsari (State Bar No. 186899)
  michael@themyerslg.com
**THE MYERS LAW GROUP**
4695 MacArthur Court, Suite 200
Newport Beach, California 92660
T:  949.825.5590
F:  949.861.6220
E: *litigation@themyerslg.com*

Attorneys for Plaintiff WUNDERWERKS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| WUNDERWERKS, INC., <br><br> Plaintiff, <br><br> v. <br><br> DUAL BEVERAGE COMPANY LLC; WNDER, LTD. doing business as W*NDER; and DOES 1 through 10, inclusive , <br><br> Defendants. | Case No. 3:21-CV-04980-SI <br><br> *The Hon. Susan Illston* <br><br> **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:  November 5, 2021 <br> Time:  10:00 a.m. <br> Crtrm.:  1 |

# TABLE OF CONTENTS

I.   THE WUNDER® MARK IS VALID ............................................................................... 5

   a.   No Fraud Was Committed in the Submission of the Trademark's Application ............ 5

   b.   Radix's Use Was Sufficient to Qualify For Registration ................................................ 7

   c.   The WUNDER® Mark Was Not Abandoned Following Its Registration ...................... 8

      i.   Wunderwerks' Intended to Resume Use ................................................................... 9

      ii.  No Substantial Change in Nature of Goods Sold Under Mark ................................ 10

II.  DEFENDANTS HAVE CONSIDERABLE COMMERCIAL STRENGTH ................... 13

III. IRREPARABLE HARM ................................................................................................. 15

IV.  BALANCE OF EQUITIES ............................................................................................. 17

CONCLUSION ........................................................................................................................ 18

THE MYERS LAW GROUP
4695 MACARTHUR COURT, SUITE 200
NEWPORT BEACH, CALIFORNIA 92660
Tel 949.825.5590 • Fax 949.861.6220 • E-mail: litigation@themyerslg.com

**Federal Cases**

*2die4kourt v. Hillair Capital Mgm't, LLC*, 2016 U..S. Dist. LEXIS 118211 ................................. 17
*Alacritech, Inc. v. Microsoft Corp.*, 2005 U.S. Dist. LEXIS 51698 .......................................... 17
*Allard Enterprises Inc. v. Advanced Prog. Res., Inc.*, 146 F.3d 350, 358 (6th Cir. 1998)................ 7
*Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 906 (E.D.N.Y. 1987) ...................... 9
*Brady v. Grendene USA, Inc.*, 2015 U.S. Dist. LEXIS 72551 ................................................ 11
*Clifford Ross Co. v. Nelvana, Ltd.*, 710 F.Supp. 517, 521 ................................................. 17
*Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1391-92 ........................................... 10
*Department of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1126 (9th Cir. 2006)...... 7
*Edwin K. Williams & Co. v. Edwin K. Williams & Co.-East*, 542 F.2d 1053, 1059 (9th Cir. 1976) 9
*Exxon Corp. v. Oxxford Clothes Inc.*, 109 F.3d 1070, 1077 & 1079-1080 ................................... 12
*Glamorene Prods. Corp. v. Procter & Gamble Co.*, 538 F.2d 894, 895 ...................................... 11
*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 ................................................... 17
*Grocery Outlet, Inc. v. Albertson's, Inc.*, 497 F.3d 949, 952 (9th Cir. 2007) ............................. 9
*Independent Baking Powder Co. v. Boorman*, 175 F. 448 ...................................................... 12
*King v. Innovation Books*, 976 F.2d 824, 831 ................................................................ 17
*La Societe Anonyme des Parfiums le Galion v. Jean Patou Inc.*, 495 F.2d 1265, 1272 (2nd Cir. 1974) ............................................................................................................ 8
*Main St. Outfitters, Inc. v. Federated Dep't Stores*, 730 F.Supp. 289, 290 & 292 (D. Minn. 1989) ............................................................................................................ 11
*Marvel Comics Ltd. v. Defiant*, 837 F. Supp. 546, 550 (S.D.N.Y. 1993) ..................................... 7
*Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 508 .................................................... 17
*Pappan Int'l, Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 ........................................ 18
*Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 976 ....................................................... 17
*Rivard v. Linville*, 133 F.3d 1446, 1449 (11th Cir. 1998) ................................................... 9
*Warner Bros. Entm't v. Global Asylum, Inc.*, 107 U.S.P.Q.2d 1910, 1927 ................................... 17
*Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 .................................................. 18
*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ...................................... 4, 7

**Federal Statutes**

15 U.S.C. § 1116 ................................................................................................. 15

**Other Authorities**

*Bellanca Aircraft Corp. v. Bellanca Aircraft Eng'g, Inc.*, 190 U.S.P.Q.2d 158, 167 (T.T.A.B. 1976) ............................................................................................................. 8
*Brewski Beer Co. v. Brewski Brothers, Inc.*, 1998 T.T.A.B. LEXIS 116 .................................... 11
*Double Coin Holding v. Tru Dev.*, 2019 U.S.P.Q.2d 377409 at * 15 (T.T.A.B. 2019)(section 1127(1)) ............................................................................................................ 8
*E.I. Du Pont De Nemours & Co. v. Big Bear Stores, Inc.*, 161 U.S.P.Q. 50, 51 (T.T.A.B. 1969) ... 7
GILSON ON TRADEMARKS §3-10[4] ................................................................................ 9
*Kaplan v. Faulding Healthcare (IP) Holding, Inc.*, 2021 TTAB LEXIS 227 ................................ 10

THE MYERS LAW GROUP
4695 MACARTHUR COURT, SUITE 200
NEWPORT BEACH, CALIFORNIA 92660
Tel 949.825.5590 • Fax 949.861.6220 • E-mail: litigation@themyerslg.com

In determining whether to grant Wunderwerks' motion for a preliminary injunction five points must be weighed and considered along a sliding scale: (i) The validity of the WUNDER® mark; (ii) the likelihood of consumers being confused; (iii) whether Wunderwerks will suffer irreparable harm in the absence of an injunction; (iv) does the balance of equities favor issuance of an injunction; and (v) does the public interest favor issuing the injunction. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Before addressing what is said in Defendants' Opposition on these points, it is important to note what was left unaddressed in the Opposition. Save for a single paragraph making a passing reference to but one of the *Sleekcraft* eight-factor likelihood of confusion test, Defendants do not contest that Wunderwerks has established that there is a strong likelihood of consumers being confused between the parties' competing marks on their respective goods. Likewise, Defendants do not contest that issuance of a preliminary injunction in favor of Wunderwerks would be in the public interest.  Those two points are **conceded**.

Instead, what Defendants do seek to contest is the validity of the WUNDER® mark and through it the good name of Wunderwerks. The opposition is riddled with innuendo, supposition, and conjecture that the application Wunderwerks filed to secure the WUNDER® mark is built on fraud and/or the mark must have been abandoned. This is not the first time Wunderwerks has heard this tale from Defendants. After Wunderwerks submitted a cease and desist letter to Defendants on February 23, 2021, Defendants precipitously filed a Petition to Cancel the WUNDER® mark,[1] claiming it was procured by fraud. Yet interestingly, on the same day Defendants also sent a letter asking questions and seeking information from Wunderwerks to corroborate their belief. (Second Decl. Kowsari ¶4 & Ex. 12) Wunderwerks thereafter proffered to Defendants the same chain of events leading to the registration of the WUNDER mark and provided the same documents to substantiate the validity of the mark as was recited in the Motion, including redacted copies of invoices and the assignment agreement between Wunderwewrks' and its parent company Radix Labs ("Radix"). (*Id*. ¶5) A little more than a month later on May 27, 2021, the parties' conducted a

---

[1] Specifically, three weeks later on March 18, 2021.

discovery conference whereat Defendants reiterated their previous belief that fraud had been committed. When Wunderwerks offered to provide additional evidence to substantiate the validity of its mark, Defendants' counsel rejected each piece of evidence offered, ultimately noting that his clients are invested in their mark, are well-capitalized, and intend to fully litigate the matter. (*Id*. ¶8)

That to this day Defendants continue to peddle in such notions speaks more to the weakness of their defense than it detracts from the strength of Wunderwerk's case.

I.   **THE WUNDER® MARK IS VALID**

   a.   **No Fraud Was Committed in the Submission of the Trademark's Application**

Defendants insist that the application that lead to the registration of the WUNDER® mark is suspect. What is the evidence leading them to question the veracity of the representations in the mark's application?

Defendants breathlessly direct the reader's attention to Wunderwerks' social media posts indicating that **since June 2020** the company has marketed a line of sparkling fruit beverages with CBD- and THC- added to it (a point Wunderwerks freely acknowledged in the Motion). (Opp. at 4) They then quickly pivot to note the specimens submitted to the USPTO in **October 2019** do "not contain any actual product labels" that would demonstrate that no CBD or THC- had been added to the beverage. (*Id*. at 5). In addition, they opine that the image of the specimen in the application "appears" to be "digital images, computer illustrations or rudimentary mockups" not "legitimate product packaging." (*Id*.) And what of those invoices Wunderwerks submitted showing sales of 1,000 10 oz. uninfused Lemon-Ginger flavored sparkling fruit beverages to retailers in California and Florida over a five month period from April through August, 2019? Defendants' posit that there are serious questions about their authenticity because the customer's name was redacted, the invoices show payment in cash, there is no shipping terms or taxes "one would expect to see," the branding on the invoice (Wunder) was different from that used in the specimens (Wünder), the "title" of the customer signing the invoice was listed as "owner," and the signature for the customer in Florida was "visually different." (*Id*. at 6).

The evidentiary foundation upon which Defendants' belief is built rests solely on the personal opinion of their CEO. (Decl. Robinson ¶¶ 8, 10, 12, 15-17, 20) There is no independent

analysis or opinion from an unbiased source, let alone one who would have the knowledge or expertise to reach the conclusions now being offered on such issues as the nature of digital images or handwriting analysis. Wunderwerks does not doubt that Defendants' CEO fervently believes what she has attested to, but her perception of these purported "facts" is biased. The truth is far different and far less dramatic than those concocted by Defendants.

Wunderwerks predecessor in interest, Radix, developed a line of uninfused sparkling fruit beverages beginning in late 2018 through the spring of 2019. (Chialtas Decl. ¶4) After developing a flavor it was satisfied with – a 10 oz Lemon Ginger flavored sparkling fruit beverage – Radix shipped its first 200 beverages on April 1, 2019 to H&K Market located at 1300 Fitzegerald Avenue in San Francisco, California. (Second Chialtas Decl. ¶3 & Ex. J) Mr. Masama "Sam" Freji signed the invoice, identifying himself as the owner of the retail store. (*Id*.) Thereafter Radix delivered more of its uninfused Lemon Ginger sparkling fruit beverage to retail shops located in Venice, California (Trading Post Liquor store), and in Holmes Beach, Florida (Live Naturally store). (*Id*.)

The reason the invoices identified the purchasers as the owner was because the signer was in fact the owner of the retail store where the beverages were shipped. Those "visually different" signatures by the store owner in Florida – Mr. Benjamin Bryant – are actually his. (Decl. Benjamin Bryant ¶5). The conjecture that the beverages sold contained the extra ingredient of CBD and/or THC- in it is not so. The beverages were, in fact, sparkling fruit beverages with nothing added. (*Id*. ¶¶3-4). The questionable specimen packaging was in fact real. Radix spent over $3,400 on packaging and branding for the beverages it shipped. (Second Decl. Chialtas ¶4 & Ex. K; Bryant Decl. ¶2).

Ironically, Wunderwerks offered to provide all of this information to Defendants during the discovery conference held at the end of May, 2021, but they rejected it. (Second Decl. Kowsari ¶8)

In sum, Wunderwerks' predecessor did, in fact, sell 1,000 10 oz Lemon Ginger flavored uninfused sparkling fruit beverages to third-party retailers in California and Florida from April 1, 2019 through August 2019. The representations asserted in the mark's application that it was first used in commerce on April 1, 2019 in connection with uninfused sparkling fruit beverages were and are all true.

THE MYERS LAW GROUP
4695 MACARTHUR COURT, SUITE 200
NEWPORT BEACH, CALIFORNIA 92660
Tel 949.825.5590 • Fax 949.861.6220 • E-mail: litigation@themyerslg.com

### b. Radix's Use Was Sufficient to Qualify For Registration

Pressing ahead, Defendants next argue that Radix's commercial activity was insufficient to qualify the WUNDER® mark for registration when the trademark application was filed in October, 2019. (Opp. at 9)

The Lanham Act requires that for a mark to qualify for registration the owner must show that at the time of the application it had "used" that mark "in commerce." *See* 15 U.S.C. §1051(a)(1). "Use in commerce" means the "bona fide use of a mark in the ordinary course of trade, and not merely to reserve a right in a mark." 15 U.S.C. § 1127. A single sale followed by activities proving a continuous effort to use the mark has been found sufficient to meet the "use in commerce" requirement. *Department of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1126 (9th Cir. 2006); *Allard Enterprises Inc. v. Advanced Prog. Res., Inc.*, 146 F.3d 350, 358 (6th Cir. 1998).

Here, Radix meets the "use in commerce" requirement in spades. It not only made a commercial sale of its product on April 1, 2019 to a third-party retail store, but it thereafter sold more units (totaling 1,000) of its product to other retail stores in two states over the five month period immediately preceding the filing of its trademark application. Such activity clearly demonstrates a continuous effort to use the mark. *See E.I. Du Pont De Nemours & Co. v. Big Bear Stores, Inc.*, 161 U.S.P.Q. 50, 51 (T.T.A.B. 1969)(finding that small volume of sales as part of test marketing plan was "sufficient to show a continuous use of the mark in question"); *Allard*, 146 F.3d at 359 (finding use in commerce met through owner's placement of mark "on at least one fax, on at least one resume, and in numerous solicitations" over a one-year period). Just as importantly, Radix's commercial activities were sufficiently public to qualify for registration. *See Marvel Comics Ltd. v. Defiant*, 837 F. Supp. 546, 550 (S.D.N.Y. 1993)("The talismanic test is whether or not the use was sufficiently public to identify or distinguish the marked goods in appropriate segment of the public mind as those of the adopter of the mark"). Here, Radix's activity led to the placement of 1,000 individual 10 oz Lemon Ginger flavored sparkling fruit beverages on store shelves in two states for purchase by consumers.

Defendants dispute this conclusion, arguing that "sales to less than five customers [sic] [retailers] with no subsequent commercial use is not the kind of bona fide commercial use" needed.

(Opp. at 10). The lone authority offered is reference to a Second Circuit case where the sale of just 89 bottles of perfume over a twenty-nine year period, *see La Societe Anonyme des Parfiums le Galion v. Jean Patou Inc.*, 495 F.2d 1265, 1272 (2nd Cir. 1974), and a Board decision where two airplanes were sold (each for $1) over a five year period, *Bellanca Aircraft Corp. v. Bellanca Aircraft Eng'g, Inc.*, 190 U.S.P.Q.2d 158, 167 (T.T.A.B. 1976), were each held as insufficient. The facts in the present case, however, are lightyears removed from either of those cases. The volume of the sales and the persistency with which those sales were made over a sustained period amply supports a finding that a bona fide use of the WUNDER® mark had been made before the application to register the mark was filed in October, 2019.

    **c.**     <u>**The WUNDER® Mark Was Not Abandoned Following Its Registration**</u>

Defendants next opine the mark was abandoned because: (1) Wunderwerks stopped using the mark on uninfused sparkling fruit beverages with no intent to resume such use, (Opp. at 11), and (2) whatever goodwill that was associated with the mark from Radix's commercial activity was abandoned when Wunderwerks substantially changed the nature of the goods the mark was sold under – from a sparkling fruit beverage to a sparkling fruit beverage using basically the same formula as its predecessor but also containing a single additional ingredient of CBD in it. (Opp. at 11-12)

The criteria to establish abandonment is set forth in section 1127 of the Lanham Act, which provides:

> A mark shall be deemed abandoned if either of the following occurs:
>
> (1)     When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for three consecutive years shall be prima facie evidence of abandonment . . .
>
> (2)     When any course of conduct of the registrant . . . causes the mark . . . to lose its significance as a mark[, *i.e.,* as an indication of origin].

15 U.S.C. § 1127. Defendants bear the burden of proof to establish the existence of either criteria. *See Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1079-80 (5th Cir. 1997) section 1127(2)); *Double Coin Holding v. Tru Dev.*, 2019 U.S.P.Q.2d 377409 at * 15 (T.T.A.B. 2019)(section 1127(1)). Not only does the burden rest on Defendants' shoulders, but the amount of proof required

is also a heavy one. *See Grocery Outlet, Inc. v. Albertson's, Inc.*, 497 F.3d 949, 952 (9th Cir. 2007)(Wallace, J., concurring)(declaring Ninth Circuit precedent requires for defendant prove abandonment for non-use with intent not to resume it must do so by "clear and convincing evidence"); *Edwin K. Williams & Co. v. Edwin K. Williams & Co.-East*, 542 F.2d 1053, 1059 (9th Cir. 1976)(labeling burden to meet under section 1127(2) as a "high" one). The reason the burden is made one difficult to reach is because abandonment (unlike acquisition of the right to a mark) serves as the forfeiture of a party's vested property right. *See Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 906 (E.D.N.Y. 1987) ("The case law is uniform that the discontinuity in product that works as a forfeiture or abandonment of a trademark is an extreme one").[2] Nothing in the Opposition meets this very high, strict burden of proof.

i. **Wunderwerks' Intended to Resume Use**

Defendants state that following registration of the WUNDER® mark "a substantial gap of time [has] passed with no use . . . and clearly no intention to resume use." (Opp at 11). That is their sole "argument." Neither point in it is correct.

Wunderwerks readily admits that it has not used the WUNDER® mark on uninfused sparkling fruit beverages since the end of 2019. But the roughly two year period of non-use is well short of the three-years required to create a *prima facie* presumption of intent not to resume. Other than Defendants' self-serving proclamation that Wunderwerks "clearly" did not intend to resume use, they have offered nothing to substantiate, let alone build an evidentiary foundation, such a conclusion.

The type of evidence courts have found significant in resolving whether there is an intent to resume are activities a reasonable business would undertake if they were planning on resuming use in the reasonably foreseeable future. *See* 1 GILSON ON TRADEMARKS §3-10[4](observing "business records on market research and product development" as well as "negotiations relevant" to "resuming use" satisfy this requirement); *Rivard v. Linville*, 133 F.3d 1446, 1449 (11th Cir. 1998).

---

[2] 1 GILSON ON TRADEMARKS §3.10[10][b] (observing that abandonment under section 1127(2) "is in the nature of a forfeiture of rights, and the party seeking to establish it has a very strict burden of proof to sustain")

To that end, courts have repeatedly held that a registrant's engagement in product development activities demonstrates it had an intent to resume use. *See Kaplan v. Faulding Healthcare (IP) Holding, Inc.*, 2021 TTAB LEXIS 227 at *66 (T.T.A.B. June 21, 2021)(finding intent to resume based on registrant's product development activities and discussions with manufacturer to make product in future); *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1391-92 (Fed. Cir. 2010)(finding intent to resume based on registrant's discussions with third parties to serve as its exclusive retailer and "research and development efforts," including "brainstorming" ideas for product line and "research[ing] and test[ing]" product).

As indicated in Wunderwerks' Motion and supporting declaration, (Mot. at 5; Decl. Peterson ¶9), and now supplemented with further detail, (Second Decl. Alexi Chialtas ¶¶ 5-7 & Ex. L), beginning in 2019 and continuing to the present Wunderwerks has engaged in significant and continuous research and development activities related to expanding its line of uninfused sparkling fruit beverages. The need for such product development arose from the fact that prior to assigning its goodwill to the mark, Radix had developed but a single flavor for its beverage – Lemon Ginger. Wunderwerks' product development activities have included the purchase of equipment, raw materials and packaging. Those facilities have been used to create different blends of uninfused sparkling fruit beverages. Promising candidates identified from this experimentation have been offered to consumers as part of a taste test survey to gauge each new flavors desirability. From these R&D activities, Wunderwerks has developed a new and more fully developed line of uninfused sparkling fruit beverages in five different flavors. Wunderwerks is now in the process of securing a manufacturer so that it can release in early 2022 this more robust line of uninfused sparkling fruit beverages under the WUNDER® mark.

Given this evidence, Defendants have failed to meet their heavy burden of showing that Wunderwerks had no intent to resume use of the mark on uninfused sparkling fruit beverages.

      **ii.**     <u>**No Substantial Change in Nature of Goods Sold Under Mark**</u>[3]

---

[3] Defendants also argue that no assignment of the goodwill attached to the WUNDER® mark was made because the agreement failed to include the word "goodwill" in it. (Opp. at 11) This point is misdirected. It has long been held that transfer of a business' goodwill does not require reciting the

Defendants next contend that Wunderwerks use of its mark **for the past twelve months** on only sparkling fruit beverages with the added ingredient of CBD constitutes a total and complete forfeiture of all the goodwill in the mark assigned to it (notwithstanding Wunderwerks concrete plans to release its more robust line of uninfused sparkling fruit beverages early next year). According to Defendants, by adding CBD, "a psychoactive ingredient" so "substantial[y], and so changes the nature of the product, it puts the product into an entirely new category of products, one with an entirely new type of consumer, separate and distinct channels of trade." (Opp. at 13). According to Defendants assignees are permitted to make only "small," "unimportant" changes to a prior product line or face abandoning their rights the moment a change is made, regardless of how long that product has been sold alone in the marketplace. (*Id*.) Defendants have not only overread the caselaw, but they have ignored the nature of the products in question.

The cases are quite clear that only a decision by an assignee to make a clear break with the prior product that represents not only a fundamental change in the nature of the product but that also serves to deceive consumers as to the nature and origin of the product from its predecessor will suffice to establish abandonment. Thus, even significant changes made to a product have been held not to constitute a forfeiture be it transitioning a mark's use from a "bar" only selling liquor to a traditional "restaurant," *Brewski Beer Co. v. Brewski Brothers, Inc.*, 1998 T.T.A.B. LEXIS 116 at *29-30 (T.T.A.B. 1998), or from leather "high fashion shoes" to plastic "flip flops," *Brady v. Grendene USA, Inc.*, 2015 U.S. Dist. LEXIS 72551 at *20-21 (S.D. Cal. June 3, 2015), or from "women's dress coats" to "men and women's" "raincoats and other apparel items," *Main St. Outfitters, Inc. v. Federated Dep't Stores*, 730 F.Supp. 289, 290 & 292 (D. Minn. 1989), or from "dry cleaning detergent" to "fabric softer." *Glamorene Prods. Corp. v. Procter & Gamble Co.*, 538 F.2d 894, 895 (C.C.P.A, 1976). Instead, the change (regardless of its magnitude) must be shown, upon a review of all of the facts and a determination made on a case-by-case approach, as also

---

word "goodwill" or any other magic term or phrase. *See Wawak Co. v. Kaiser*, 90 F.2d 694, 698 (7th Cir. 1937). Here, the parties' assignment agreement made it clear that not only was Radix's rights to the WUNDER® mark transferred to Wunderwerks but so too were any other rights "forming a part of, embodied in or [that are] necessary for use of the property," including "intangible" property such as "formulas, know-how, methods, processes" and "techniques." That is more than enough for the goodwill to have been transferred.

working as a deceit on the public. *See Exxon Corp. v. Oxxford Clothes Inc.*, 109 F.3d 1070, 1077 & 1079-1080 (5th Cir. 1997).

The lone case offered by Defendants as standing to the contrary – *Independent Baking Powder Co. v. Boorman*, 175 F. 448 (D. N.J. 1910) – actually supports this principle.

In *Boorman*, the assignor had for fourteen years placed the mark on baking soda using a formula containing alum. 175 F. at 450, 455 (noting assignor used a "formula of the baking powder" with "alum"). After the mark was transferred, the assignee changed the baking powder's formula by "substituting phosphate for alum." *Id*. The newly formulated powder was then sold to consumers under the mark for ten years without any offering of the original formula used by the assignor, *id*. at 449, and apparently without any indication made to consumers about the different nature of the formula used. This was significant because the price for alum baking powder was higher than that of phosphate baking powder. *Id*. at 455-56. This prompted the court's heightened concern that the assignee's conduct was done "chiefly as a ready and efficient way of meeting competition in the prices of baking powder." *Id*. at 456.

None of the salient constellation of facts from *Boorman* exist here. Unlike in *Boorman*, Wunderwerks has not made a decision for a clean break from Radix's product line. Instead, it has undertaken research and development activities over the past year such that it has now developed five different flavors of uninfused sparkling fruit beverages. These R&D activities have also proceeded deep enough that the company has concrete, particularized plans to release this fuller line of uninfused beverages beginning early next year. Also unlike *Boorman*, the infused sparkling fruit Lemon-Ginger beverage tastes like the uninfused sparkling fruit Lemon-Ginger flavor. (Second Chialtas Decl. ¶¶8-9) The nature of the two beverages therefore retain a vital link (outside of the mark) identifying them as having a common origin. *See Exxon*, 109 F.3d at 1079 ("if a trademark has not ceased to function as an indicator of origin there is no reason to believe that the public will be misled"). The only difference is that the infused beverage has a single added ingredient that admittedly affects the imbiber's mental state, but not the drink's taste. (*Id*.) In all other respects the two beverage's formula remains basically the same. (*Id*.) The differences between the two products is not much more than that between clearly marked can of caffeinated and un-caffeinated Coke.

1  Importantly, unlike in *Boorman*, this single difference between the two products is made clear to
2  the public. Wunderwerks infused beverages (both on individual cans and on cases) contain
3  prominent disclosures that CBD has been added to it. A consumer purchasing the infused beverage
4  would not be deceived into believing they were buying just a sparkling fruit beverage. This lack of
5  deceit on consumers is a critical difference with *Boorman*. There, not only did the assignee use the
6  mark on a baking soda with a different formulation, but the nature of the change in the product went
7  undisclosed so that the assignee could gouge consumers into believing they were buying a higher
8  quality product when, in fact, they were not. That is decidedly not the case here.

9  Given all these facts, the strict burden of proof required, and that forfeiture through
10 abandonment is found in only extreme cases, Wunderwerks did not abandon the WUNDER® mark
11 by using it for the past twelve months on infused sparkling fruit beverages clearly marked as
12 containing CBD while at the same time developing its separate line of similarly tasting and
13 formulated uninfused beverages that are scheduled to be released to the public under the mark in the
14 next few months.

15 **II.  DEFENDANTS HAVE CONSIDERABLE COMMERCIAL STRENGTH**

16 As noted at the outset, save for one passing reference, Defendants concede that
17 Wunderwerks has established seven of the eight *Sleekcraft*-factors demonstrating that there is a
18 strong likelihood of confusion amongst the consuming public by the parties' competing goods. The
19 one exception being Defendants' commercial strength. At the outset, it must be repeated that
20 evaluation of Defendants' commercial strength is not abstract one, but one judged relative to that of
21 Wunderwerks.

22 As noted in the Motion, evidence of Defendants' commercial strength was drawn from their
23 statements, be it to the press or the USPTO, indicating that since the end of 2020 they have
24 "expanded from their existing physical market footprint in Ohio into 'another four or five markets,'
25 including Pennsylvania, Indiana and New Jersey" with plans in the "near future" to "further
26 expan[d]" into "New York, [the] Southeast and Mid-South states, and Michigan and Illinois." (Mot.
27 at 7). Those same evidentiary sources further disclosed that Defendants had received an undisclosed
28 amount of "seed money" from their CEO's prior employer, "a single agreement for future equity

round of investment' worth purportedly $1 million," and issuance this year of a "Series A round of stock shares netting them 'in the $5-7 million range.'" (*Id*. at 7-8). Finally, Defendants had publicly disclosed their efforts to accelerate this market expansion through a "partnership with direct store delivery providers" so that their product could reach store shelves much more quickly. (*Id*. at 8).

      The lone piece from this broad group of evidence Defendants attempt to dispute is the amount of money they have raised, arguing they "ha[ve] raised roughly $1.2M to date." (Opp. at 16). The source for this factual assertion is paragraph 23 of Defendants' CEO's declaration. (*Id*.) That paragraph, however, does not state Defendants only raised $1.2M in financing. Instead, the declaration attests that the company "raised a total of approximately $1,200,000 ***in seed financing***." (Decl. Robinson ¶ 23(emphasis added)). That the declaration limits the monetary figure mentioned to a particular form of investment received is important because the Motion identified three different financing sources from which Defendants obtained funds. The CEO's declaration says nothing about nor seeks to rebut the evidence presented that Defendants had received $1 million in an equity round of investment. Instead, it simply disclosed for the first time the amount of the heretofore unknown amount of "seed money" Defendants had received. Adding these two items together, Defendants have actually raised at least $2.2 million in investment. And about that Series A round of stock, the declaration attests that Defendants have not proceeded with a Series A so far this year, but importantly cabins that statement to "***at this stage***." (*Id*. (emphasis added)). Such language places no time horizon on when that "stage" may arrive. It could occur before the time this Motion is heard by the Court or sometime shortly thereafter. Just as importantly, nowhere in the declaration is it disputed that, whenever the proper stage arrives, Defendants plan to seek investment that will net them between $5-7 million. In short, Defendants are already and will soon be even more well-capitalized.

      Regardless, none of the other components evidencing Defendants' commercial strength vis-à-vis Wunderwerks is disputed. The online marketing push Defendants have engaged in, whatever the precise amount, was substantial enough such that Defendants' website appears within the first six results when a Goggle search for "Wunder beverage" is typed in is admitted. The breadth and rapidly growing extent of Defendants physical market footprint is undisputed. Indeed, since the

filing of the Motion, Defendants have released public statements indicating their market footprint has continued to grow such that they are now also being "heavily distributed" in Illinois, Maryland, and Virginia. (Second Decl. Kowsari, Ex. 15) At the time of the Motion, movement into these markets was not expected until next year.

## III. IRREPARABLE HARM

As conceded by Defendants, Wunderwerks' establishment that a likelihood of confusion exists by consumers presented by the parties' competing marks on their products creates a presumption that Wunderwerks will be irreparably harmed in the absence of a preliminary injunction.[4] 15 U.S.C. § 1116. In light of this, Defendants present only three pieces of "evidence" to rebut this presumption: (1) When the USPTO reviewed Defendants' trademark application for W*NDER it "did not cite to [Wunderwerks'] application for WUNDER as a potential conflict," (Opp. at 17); (2) a search of the USPTO database reveals "over 40 instances of various 'live' applications or registrations containing the word 'wunder' or some derivative thereof . . . in International Class 032 (which is the class that includes beverages)," and (3) Wunderwerks' delay in bringing the motion demonstrates that no irreparable harm will occur. (*Id*. 17-18)

As to the first point, the reason the USPTO did not cite to Wunderwerks' WUNDER mark when considering Defendants' application is due to the manner in which the examining attorney conducted his search. Specifically, the search terms used by the USPTO examining attorney never looked for marks with just the word "wunder" or "wonder" in it. (Second Kowsari Decl. ¶11 & Ex. 16) Instead, the examining attorney substituted the marijuana leaf symbol in Defendants mark with

---

[4] In the Motion, Wunderwerks cited to Defendants rapid expansion into geographic markets Wunderwerks' plans, but as of yet has not gone into, as affirmative evidence that it would suffer irreparable harm absent an injunction due to the loss of significant business opportunities, customers and goodwill. The Second Circuit's decision in *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37-38 (2nd Cir. 1995) was cited as authority for this proposition. Defendants argue that *Doherty* is limited to situations where party will lose a "unique opportunity" for its product. (Opp. at 18-19). The Opposition misreads *Doherty*. It is true that the court in *Doherty* found that under the facts of that case the loss of the unique opportunity provided by the contract between the parties supported a finding of irreparable harm. *Id*. But *Doherty* did not limit its finding of irreparable harm to just that specific factual circumstance. The Court noted that in general "a loss of prospective goodwill that is both imminent and non-quantifiable" would support a finding of irreparable harm. (*Id*. at 38). It is this general principal that supports a finding of irreparable harm.

an asterisk and then searched only for marks that similarly contained some variation of a non-letter symbol in it. (*Id*). Not surprisingly, with a search so truncated the examining attorney never came across Wunderwerks' mark.

With respect to the supposed "crowded trademark space" nowhere do Defendants attempt to explain the import of what is contained in these search results. Notably, all of the marks in the search results use the word "wonder" not "wunder."[5] For a significant number of the marks the term "wonder" is not even the dominant term.[6] Just as importantly, the types of products range far afield from those at issue in this case. Just by way of illustration, some are used for smoothies, others for water, some for vegetable juice, and others for beer and hard liquors.[7] Given this wide divergence in both the nature of the marks themselves and the types of product they are placed on, it is not surprising that Defendants offered nothing more than the search result itself with no argument to demonstrate the import of the results, or as demonstrated here, the lack of any.

Defendants' argument related to delay overlooks two important details. One, although it is true that Wunderwerks learned of Defendants activities in late 2020, the nature and scope of those activities changed significantly during the intervening period from when they were first discovered to the bringing the Motion. Second, the request for injunctive relief is not based on forward confusion but reverse confusion – the harm sought to be enjoined is that from a junior mark seeking to out-muscle and oust a senior mark from the marketplace.

As noted in the Motion, it was not until **after** Wunderwerks sent its cease and desist letter to Defendants in late February of this year that they accelerated their expansion into larger zones of geographic penetration. It took a period of time for Wunderwerks to discover this acceleration in Defendants' market expansion efforts.[8] *See Clifford Ross Co. v. Nelvana, Ltd.*, 710 F.Supp. 517,

---

[5] The lone exception being to Wunderwerks' mark appearing in the search result.
[6] *See e.g.*, Wonder Berry Original Russian, Wonder Berry Mors Original Russian, Wonderfruit Acai Pure Rainforest Power, Wonderfruit Acai, Wonderoak, 8th Wonder Brewery Eight Hou Tex, 8th Wonder Brewery, Alkawonder, Brew with Wonder, Drink with Joy, It's Wonderwater, Grace's Wonder Foodz Organic Essentials, and Wonders of Wheatgrass.
[7] *See* Wonderblue; Wonder Water, Wonders of Water, Boy Wonder, and Gracie's Wonder Foodz Organic Essentials; Wonders of Wheatgrass and Wonder Green; and World of Wonders, Hazy Wonder, and Winter Wonder, respectively.
[8] (Second Kowsari Decl. ¶7)

521 (S.D.N.Y. 1989)(holding delay in filing suit did not rebut presumption if the plaintiff does not know how severe the infringement is); *King v. Innovation Books*, 976 F.2d 824, 831 (2nd Cir. 1992)(delay caused by plaintiff's good faith efforts to investigate infringement does not rebut the presumption). In the interim, Wunderwerks also attempted to negotiate a resolution of the matter by offering evidence to substantiate the validity of its registration.[9] *See 2die4kourt v. Hillair Capital Mgm't, LLC*, 2016 U..S. Dist. LEXIS 118211 at *22-23 (C.D. Cal. Aug. 23, 2016)(five-month delay in attempting to informally settle claims not unreasonable). It was only after Defendants made it clear during the May 27, 2021 discovery conference that they were not interested in settlement that Wunderwerks filed suit and within six weeks thereafter brought the present Motion. Courts faced with similar factual patterns have found such delay does not rebut the presumption of irreparable harm. *See Warner Bros. Entm't v. Global Asylum, Inc.*, 107 U.S.P.Q.2d 1910, 1927 (C.D. Cal. Dec. 10, 2012)(four month delay before filing for injunction excused by investigation and settlement negotiations); *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996)(four month delay); *Alacritech, Inc. v. Microsoft Corp.*, 2005 U.S. Dist. LEXIS 51698 at *7 (N.D. Cal. April 12, 2005)(delay of a little over three months between filing of lawsuit and filing of motion for preliminary injunction); *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000)(excusing five-month delay between filing suit and moving for preliminary injunction); *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 508 (9th Cir. 1991)(excusing six-month delay between filing complaint and moving for preliminary injunction because parties were engaged in settlement negotiations).

## IV.   BALANCE OF EQUITIES

Turning to whether the balance of equities favors an injunction, Defendants go to great lengths to create a strawman argument which they thereafter vigorously go about tearing down. The strawman is in characterizing Wunderwerks position as being any harm Defendants may suffer through issuance of an injunction was self-inflicted because they knew of the WUNDER® mark

---

[9] (Second Decl. Kowsari ¶8)

before they applied for their own mark in July, 2019 or began selling their goods in early 2020 under the W*NDER mark. (Opp. at 19) That is not the basis for Wunderwerks position.

Instead, it is and always has been Wunderwerk's position that Defendants conscious and intentional effort to **accelerate and expand the nature and scope of their infringing activities after receipt of Wunderwerks' cease and desist letter in February, 2021** is what renders much, if not all, of the attendant impact an injunction may create on them as being self-inflicted. (Mot. at 22:10-12 (speaking to Defendants' intent)). The decision to accelerate their activities was a calculated one and will full knowledge of the attendant risks it could create should those activities be enjoined.[10] *See Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 (Fed. Cir. 1986)(choice to "continue" infringement); *Pappan Int'l, Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3rd Cir. 1998)(choice not to make royalty payments).

## CONCLUSION

As Wunderwerks noted in its introduction to the Motion, the undisputed facts are the textbook example of reverse confusion. Despite holding a valid and senior mark, it is being quickly ousted from the marketplace by a relatively much more cash-infused party using a nearly indistinguishable, but junior, mark on closely related goods. When that statement was made a month ago, Defendants were only selling their infringing mark in four states. Today three more have been added to that list. Although Wunderwerks has taken steps to move from its current market in California to other states next year, in the absence of an injunction, by the time that occurs it very likely will be too late. Defendants will have entered, attached consumer's awareness of "Wunder" with them and displaced any chance for Wunderwerks to penetrate the market. Given that the points for consideration weigh heavily in favor of Wunderwerks, the Court should grant the Motion.

Date: September 21, 2021

Respectfully submitted,

_____
Michael M. Kowsari
Attorneys for Plaintiff WUNDERWERKS, INC.

---

[10] Defendants cite to the fact that they have "roughly $110,000 in product inventory" with a "retail value of approximately $450,000,"(Decl. Robinson ¶ 22), as a reason equity against enjoining them. Curiously absent is any notation how much, if any, of this inventory was ordered and manufactured after receipt of Wunderwerks' cease and desist letter, or comparing the relative size/value of the current inventory from that Defendants had on hand this time last year.